IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAURICE PARKER, AND MICAH PARKER<br><br>Plaintiffs,<br><br>v.<br><br>MARK FARLEY AND AMIR MOHAMMMADI,<br><br>Defendants. | Civil Action No. 10-1004-GMS-SRF<br>(consolidated with 09-749) |
| MAURICE PARKER,<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE STATE UNIVERSITY,<br><br>Defendant. | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

The Plaintiffs, Maurice Parker ("Maurice") and Micah Parker ("Micah"),[1] who proceed *pro se*, filed this lawsuit on November 10, 2010, against Mark Farley ("Farley") and Amir Mohammadi ("Mohammadi"), alleging violations of their due process rights under the Fourteenth Amendment. (*Parker v. Farley*, 09-749, D.I. 19) Maurice also asserts claims against Delaware State University ("DSU") for employment discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, 42 U.S.C. § 1981 and

---

[1] Because this is a consolidated matter with multiple claims, for clarity of reference, the individual Plaintiffs are identified by their first names when such identification is appropriate to distinguish their respective claims, and, collectively, as "Plaintiffs." The first name references are not to be construed as attaching any less formality to consideration of the pending motion.

1

42 U.S.C. 1985, and malicious interference with business relationships. (D.I. 16; *Parker v. Farley*, 09-749, D.I. 19)

Pending before the court is the motion for summary judgment filed by Defendants Mohammadi, Farley and DSU (together, the "Defendants"). (D.I. 68) For the reasons that follow, I recommend that the court GRANT IN PART and DENY IN PART the Defendants' motion for summary judgment.

## II. BACKGROUND

DSU is located in Dover, Delaware. (D.I. 69 at 2) Mohammadi is presently DSU's Executive Vice President for Finance and University Treasurer. (D.I. 70, Ex. A at 3) At all times relevant to this matter, Mohammadi was DSU's Vice President for Finance and Administration. (*Id.* at 4) Defendant Farley is DSU's former Vice President of Human Resource and Legal Affairs. (*Id.*, Ex. B at 6-7) Farley terminated his employment with DSU in the Summer of 2008. (*Id.* at 7)

Maurice and Micah are former employees of DSU who worked as Maintenance Craftsmen Mechanics. (D.I. 76 at 2) Prior to their termination, Maurice and Micah had worked at DSU for over seventeen years, and eight years, respectively. (D.I. 77 at 2; D.I. 76 at 1) Additionally, Micah and Maurice were members of the American Federation of State, County, and Municipal Employees' ("AFSCME") Local 1267 (the "union"). (D.I. 76 at 2)

### A. The Conduct Underlying Plaintiffs' Termination

In September 2007, Memorial Hall, a building on DSU's campus, was scheduled to be demolished. (*Id.*, Ex. A) In early October 2007, Maurice began salvaging copper piping from the basement of Memorial Hall. (D.I. 16 ¶ 10; D.I. 77 at 3) On October 3, 2007, the DSU Police Department received a phone call from an employee of the contracting company that was

2

responsible for the demolition of Memorial Hall. (D.I. 70, Ex. C) The employee reported that an unnamed African-American male was removing three-foot sections of copper piping from the building. (*Id.*) The unnamed male was not caught and a police report was filed following the incident. (*Id.*)

On October 8, 2007, around 7:00 A.M., DSU Police responded to a report that someone was removing copper piping from the basement of Memorial Hall. (*Id.*) Corporal William Yossick ("Cpl. Yossick") arrived on the scene and found Micah in the basement of Memorial Hall cutting copper piping. (*Id.*) Micah told Cpl. Yossick that a supervisor had given him permission to remove the copper piping and that other employees had also been removing piping from Memorial Hall. (*Id.*) Micah further stated that he had been taking the copper piping to a recycling center nearby. (*Id.*)

Cpl. Yossick subsequently identified the recycling center as Terrapin Recycling Company ("Terrapin"). (*Id.*) Cpl. Yossick went to Terrapin and found three receipts, dated October 3, 4, and 8, 2007, with Maurice's name on them. (*Id.*; *Id.*, Ex. D) The receipts indicated that Maurice had recycled approximately 450 pounds of copper in exchange for $1,289.00. (*Id.*, Ex. D)

### B. The Investigation by DSU and the Police

On October 8, 2007, Maurice and Micah met individually with Mohammadi to discuss their salvaging of copper piping from Memorial Hall. (*Id.*, Ex. I at 26, Ex. Q at 19-20) Maurice explained that Clark Jordan ("Jordan"), the Project Manager at DSU responsible for overseeing the demolition of Memorial Hall, had given them permission to salvage the copper piping. (*Id.*, Ex. I at 28-29) Mohammadi advised Micah that he was being placed on paid administrative leave for theft of DSU property. (*Id.*, Ex Q at 19-20)

3

On October 9, 2007, Maurice met with Chief Overton of the DSU police department in connection with the investigation of the theft of the copper piping. (D.I. 77 at 6) Maurice reiterated his belief that he was authorized to take the copper piping from Memorial Hall. (*Id.*) On October 10, 2007, Maurice met with Mohammadi for a second time. (D.I. 70, Ex. I at 47-51) Maurice was represented by Clarence Selby, the President of AFSCME. (*Id.*) During the meeting, Maurice was given two documents. (*Id.*) One document indicated that Maurice was being placed on paid administrative leave pending the investigation of his "alleged theft of [DSU] property." (*Id.*, Ex. J) The other document advised that DSU intended to terminate Maurice's employment due to his "involvement in the theft of [DSU] property and misuse of [DSU] resources." (*Id.*, Ex. K)

On October 11, 2007, Maurice sent DSU a written request for a pre-termination hearing pursuant to the Collective Bargaining Agreement between DSU and the union. (*Id.*, Exs. K & L) Maurice included with the request money orders totaling $1,026.00, and a letter explaining that he had "no criminal intent" and the money was restitution for the copper piping he salvaged. (*Id.*, Ex. L)

On October 15, 2007, Maurice and Micah were arrested and charged with theft in connection with their salvaging of copper piping from Memorial Hall. (*Id.*, Exs. G & H) The State ultimately chose not to pursue the charges against Maurice and Micah, and entered judgments of *nolle prosquis* on December 11, 2007, and January 7, 2008. (*Id.*, Exs. G & H)

### 1. Maurice's Pre-Termination Hearing

On October 16, 2007, Debbie Rousel, Mohammadi's assistant, and Mohammadi, attempted to contact Maurice by phone to schedule a pre-termination hearing. (*Id.*, Ex. M) They left four messages on Maurice's answering machine, stating that a pre-termination hearing would

4

be held on October 17, 2007 at 4:00 P.M. (*Id.*) Clarence Selby was also notified of the hearing. (*Id.*, Ex. O)

Maurice did not show up for the hearing on October 17, 2007. (*Id.*, Ex. I at 54-56) According to Maurice, he did not receive any of the messages until after the date of the hearing because he had been working. (*Id.*) Maurice contacted Farley[2] to explain the situation and attempted to reschedule the hearing. (*Id.*)

DSU subsequently sent two letters to Maurice, both dated October 17, 2007. The first letter indicated that Maurice's employment was being terminated due to his theft of DSU property (i.e., the copper piping), and for using work time and a work vehicle to commit the theft. (*Id.*, Ex. N) The second letter advised Maurice that DSU was willing to give him a second chance to schedule a pre-termination hearing. (*Id.*, Ex. O; D.I. 69 at 6) Thereafter, a pre-termination hearing was scheduled for October 24, 2007. (*Id.*, Ex. I at 88)

On October 24, 2007, Maurice appeared for the pre-termination hearing and was represented by Karen Valentine, a staff representative for the union. (*Id.*) Maurice presented a copy of an email from Clark Jordan that, he claims, establishes that Jordan gave him permission to salvage the copper piping from Memorial Hall. (*See* D.I. 77 at 8; *Id.*, Ex. A; D.I. 70, Ex. P) Maurice testified he did not participate further, in part, because there were criminal charges pending against him and he did not want to incriminate himself. (D.I. 70, Ex. I at 90) DSU ultimately determined that Maurice's employment should be terminated.

### 2. Micah's Pre-Termination Hearing

On October 15, 2007, Farley sent Micah a letter stating that his employment with DSU

---

[2] Maurice testified that he called Farley, rather than Mohammadi or his assistant, because he had been informed earlier that Farley was the individual responsible for conducting the pre-termination hearing. (D.I. 70, Ex. I at 57)

5

was being terminated due to his theft of copper piping from Memorial Hall. (D.I. 70, Ex. S) According to Farley, at the time he sent the letter, he was under the impression that Micah had declined to have a pre-termination hearing, despite being given the opportunity to schedule one. (*Id.*, Ex. T)

Micah received Farley's letter on October 19, 2007, and contacted Farley to explain that he had never been advised of his right to a pre-termination hearing. (*Id.*, Ex. Q at 23-24) Farley subsequently adjusted the effective date of Micah's termination to October 24, 2007, and scheduled a pre-termination hearing for November 13, 2007. (*Id.*, Ex. T)

Micah did not show up for the pre-termination hearing on November 13, 2007. (*Id.*, Ex. Q at 35) He testified that he missed the hearing because he misread the scheduled date. (*Id.*) DSU declined Micah's request for a new hearing date and ultimately terminated his employment. (*Id.*)

### C. The Arbitrations

Maurice and Micah each filed grievances regarding their terminations from DSU pursuant to the terms of the union's Collective Bargaining Agreement. (*See* D.I. 77, Ex. W) The grievances resulted in arbitrations before separate, neutral arbitrators. (D.I. 70, Exs. U & V) In both arbitrations, the arbitrators rejected Maurice and Micah's claims that they had permission to salvage the copper piping, and upheld DSU's decision to terminate their employment. (*Id.*, Exs. U & V)

### D. Maurice's Subsequent Employment with Absolute HVAC

In April 2008, following his termination from DSU, Maurice began working for Absolute HVAC ("Absolute"). (*Id.*, Ex. I at 109-110) Absolute was under contract with DSU to perform

6

work on several projects on DSU's campus. (*Id.* at 110-112) Maurice was assigned to work on some of the projects. (*Id.*)

In July 2008, Absolute terminated Maurice's employment. (*Id.* at 110) It is unclear from the record why Maurice was terminated. According to Maurice, his termination from Absolute was based on a combination of interference by the Defendants and racial discrimination by Absolute. (D.I. 77 at 14; D.I. 70, Ex. I at 124, 126-27, 130) Maurice alleges that the Defendants made "malicious statements" that they "knew were not true" to Absolute, which caused Absolute to terminate his employment. (D.I. 77 at 14) Maurice further asserts that Will Mozingo, a co-owner of Absolute, told him that "the ultimate reason his employment was being terminated" was because the Defendants advised Absolute that he "could not work on campus unsupervised, due to allegations of theft." (*Id.*)

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)). Pursuant to Rule 56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine

7

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir.1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

## IV. DISCUSSION

### A. Due Process Claims

#### 1. Section 1983 Standards

Plaintiffs claim that they were denied due process under the Fourteenth Amendment in violation of 42 U.S.C. § 1983. (D.I. 77 at 9) Specifically, Plaintiffs contend that the employment termination process utilized by DSU deprived them of their right to a fair hearing. (*Id.* at 10)

8

"To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). Here, Plaintiffs claim that DSU violated their federal due process rights by firing them without process. (*See Parker v. Farley*, 09-749, D.I. 19)

A plaintiff who seeks to establish a procedural due process claim must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

In the present case, there is no dispute that Plaintiffs had individual property interests in their jobs, and that their termination constitutes a deprivation of those interests. (D.I. 69 at 10) Accordingly, the relevant issue is whether DSU's termination procedure afforded Plaintiffs due process of law. With respect to pre-termination procedures, the Supreme Court has held that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

"'The tenured public employee is entitled to [pre-termination process consisting of] oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009) (quoting *Loudermill*, 470 U.S. at 546). A pre-termination hearing "need not be elaborate," but "[t]he opportunity to present reasons, either in person or in

9

writing, why proposed action should not be taken is a fundamental due process requirement." *Loudermill*, 470 U.S. at 545-46. "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 545 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976)); *see also Biliski*, 574 F.3d at 219. "The pretermination hearing may be informal so long as it affords the employee an opportunity to make any 'plausible arguments that might . . . prevent [the] discharge.'" *Fraternal Order of Police, Lodge No. 5 v. Tucker*, 868 F.2d 74, 79 (3d Cir. 1989) (alterations in original) (quoting *Loudermill*, 470 U.S. at 544).

### 2. Notice of the Charges

#### a. Maurice

Maurice had notice of the charges against him prior to his termination. Maurice claims that he was terminated on October 17, 2007. (D.I. 77 at 10; D.I. 70, Ex. I at 67). Maurice testified that, prior to October 17, 2007, he was aware of DSU's intent to terminate his employment based on its belief that he had stolen copper piping, (*See* D.I. 70, Ex. I at 77) The record reflects that Maurice was on notice of the charges as early as October 10, 2007, when he met with Mohammadi. Although Maurice disputes whether he had "knowledge of the charges through any conversation with Mohammadi" (D.I. 77 at 10), he admitted that he was aware of the allegations by virtue of two documents provided to him at the meeting. (*See* D.I. 70, Ex. I at 47-51) One document indicated that Maurice was being placed on administrative leave pending the investigation of his "alleged theft of [DSU] property." (*Id.*, Ex. J) The other document advised Maurice that DSU intended to terminate his employment due to his "involvement in the theft of [DSU] property and misuse of [DSU] resources." (*Id.*, Ex. K) Thus, Maurice had notice of the charges against him prior to his termination.

10

### b. Micah

Micah had notice of the charges against him prior to his termination. Micah's employment with DSU was terminated on October 24, 2007. (*Id.*, Ex. Q at 30). The record reflects that, prior to that date, Micah was aware of DSU's intent to terminate his employment based on its belief that he had stolen copper piping. On October 8, 2007, Micah was advised orally and in writing that he was being investigated and placed on paid administrative leave for stealing copper piping. (*Id.*, Ex. Q at 19-20 & Ex. R) Furthermore, on October 15, 2007, DSU sent Micah a letter indicating that he was being terminated for "theft of [DSU] property and [his] failure to follow work rules and regulations." (*Id.*, Ex. S) Consequently, Micah had notice of the charges against him prior to the date on which he was terminated.

### 3. Opportunity to Respond to the Charges

#### a. Maurice

Maurice had an opportunity to respond to the charges against him. "Maurice has consistently maintained that he salvaged piping with the understanding that he had permission, and that salvaging was historically done by employees." (D.I. 77 at 11; D.I. 70, Ex. I at 37 & 83) Maurice testified that he provided both of these justifications to Mohammadi prior to his termination. (D.I. 70, Ex. I at 47-51, 81-83) Maurice also attended a pre-termination hearing on October 24, 2007 and was represented by Karen Valentine. (*Id.*, Ex. I at 88) He presented documentary evidence in support of his argument that he had permission to remove the copper piping from Memorial Hall. (*See* D.I. 77 at 8; *Id.*, Exs. A & W)

Maurice's argument that he did not have an opportunity to respond to the charges against him is based on the notion that, if he had received the due process he believes he is entitled to, he would have responded to the allegations differently (D.I. 77 at 11): "One of them would have

11

been to bring Mr. Jordan. . . . And I would have brung [sic] out other instances and issues and situations where [salvaging] had been done historically." (D.I. 70, Ex. I at 83) However, Maurice concedes that his employment would have been terminated regardless of whether he had presented the evidence differently. (D.I. 70, Ex. I at 84; D.I. 77 at 11). Consequently, Maurice's claim fails because he fully responded to the charges against him, and any additional process would have added no value. *See Biliski*, 574 F.3d at 223 ("Under these circumstances, we fail to see how more elaborate pre-termination proceedings (or an oral post-termination hearing) would have led to a different result.").

### b. Micah

Micah had an opportunity to respond to the charges against him. In response to the charges of theft, "Micah has consistently maintained that his supervisor permitted him to salvage materials," but also "denies ever removing any copper piping from Memorial Hall." (D.I. 76 at 3) Micah admits that he provided both of these defenses to DSU prior to his termination. (D.I. 70, Ex. Q at 46) He further admits that there are no other defenses that he could have presented. (*Id.*, Ex. Q at 48; D.I. 76 at 3) Micah had the opportunity to respond to the allegations against him during a pre-termination hearing scheduled for November 13, 2007, but he did not appear at the hearing. (*See* D.I. 70, Ex. Q at 35) Consequently, Micah had an opportunity to respond to the charges against him.

### 4. Qualified Immunity as to Defendants Farley and Mohammadi

"'[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 244 (3d Cir. 2006) (quoting

*Wilson v. Layne*, 526 U.S. 603, 609 (1999)). In evaluating a claim of qualified immunity, the court "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Id.* (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Morse v. Frederick*, 551 U.S. 393, 442 n.5 (2007). In assessing this prong, courts will routinely look to existing case law (from both within and outside this jurisdiction) to assess whether a right was "clearly established." *Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011).

Farley and Mohammadi claim that they are entitled to qualified immunity. (D.I. 69 at 14) Micah does not address in his brief the issue of qualified immunity. (*See* D.I. 76) However, Maurice contends that qualified immunity does not apply because Farley and Mohammadi violated his constitutional right to due process, and the right was clearly established at the time of the violation. (D.I. 77 at 11-12)

The court finds that Plaintiffs have not established a constitutional violation, even when viewing the facts in the light most favorable to them. As discussed previously, Plaintiffs each had notice of the charges that led to their termination and an opportunity to respond prior to being terminated. Consequently, Farley and Mohammadi are entitled to qualified immunity.

### B. Maurice's Claim Against DSU for Title VII Discrimination

A plaintiff's discrimination claim under Title VII is analyzed according to the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431-32 (3d Cir. 1997); *Shahin v.*

13

*Delaware*, 2010 WL 4975653, at *4 (D. Del. 2010). Under this framework, a plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, the burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Id.* If this burden is met, the plaintiff must then demonstrate that the defendant's asserted rationale is pretextual. *Id.* 804-05. If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *See Shahin*, 2010 WL 4975653, at *4.

A *prima facie* discrimination case under Title VII requires the plaintiff to show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than the plaintiff. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003), *cert. denied*, 541 U.S. 1064 (2004); *Miller v. Del. Dep't of Prob. & Parole*, 158 F. Supp. 2d 406, 410-11 (D. Del. 2001).

The first three elements of Maurice's *prima facie* case are not in dispute. (*See* D.I 69 at 15) Maurice, as an African-American, is a member of a protected class and was qualified for his position at DSU. Moreover, his termination was an adverse employment action. Therefore, the court turns to the final element – whether Maurice's termination occurred under circumstances that gave rise to an inference of unlawful discrimination.

A plaintiff may establish an inference of discrimination in many ways but must produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). "The central

14

focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race . . . ." *Sarullo*, 352 F.3d 789, 798 (quoting *Pivirotto*, 191 F.3d at 352) (internal quotation marks omitted).

Maurice alleges that his termination was motivated by unlawful racial animus. (D.I. 77 at 13) He relies on comparator evidence to establish an inference of discrimination.

"Where evidence of allegedly disparate treatment meted out to 'similarly situated' employees outside of the protected class is relied upon, those individuals must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.'" *Davis v. City of Phila. Water Dep't*, 57 F. Appx. 90, 92 (3d Cir. 2003) (citation omitted). "Whether a comparator is truly similarly-situated to the plaintiff is an issue of law." *Moore v. Shinseke*, 487 F. Appx. 697, 698 (3d Cir. 2012) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645-46 (3d Cir. 1998)).

Maurice alleges that two men, Art Hewitt ("Hewitt") and Charles Dougherty ("Dougherty"), who are non-African-American, were employed by DSU in the same department as Maurice, and were disciplined less severely despite engaging in conduct similar to the activity at issue here. (D.I. 77 at 13) DSU counters that Hewitt and Dougherty are improper comparators because they did not steal or salvage materials from DSU for their own personal gain. (D.I. 69 at 15-18) However, Maurice disputes DSU's version of the facts underlying Hewitt and Dougherty's conduct. (D.I. 77 at 13)

According to Maurice, Hewitt stole "aluminum clock casings and other metals" from DSU, and "frequently salvaged valuable materials from DSU," yet Hewitt was disciplined only for insubordination, rather than theft, and his employment was not terminated. (*Id.*) Maurice

15

asserts that Farley and Mohammadi conducted the investigation of Hewitt, and Randy Jones authored the related letter of findings. (*Id.* at 13-14)

DSU claims that Hewitt did not steal or salvage DSU property for his own personal gain. (D.I. 69 at 16) "Instead, Hewitt removed Plexiglass from [DSU], brought it home to make clock covers for [DSU], and then returned it to [DSU]. Although Hewitt was instructed to cut the Plexiglass at work, he thought he could do a better job using his personal equipment at home." (*Id.*) Hewitt was ultimately disciplined for "insubordination for removing [DSU] property without authority and for cutting the Plexiglass at home." (*Id.*) DSU asserts that Randy Jones was the decision-maker in Hewitt's case. (*Id.* at 16-17)

With respect to the second comparator, Maurice claims that Dougherty "was found to have taken top soil from [DSU], without permission, to use on a job for his personal gain. Dougherty also had taken [DSU's] backhoe and dump truck, without permission, for His [sic] own personal gain." (D.I. 77 at 13)

DSU counters that Dougherty did not steal or salvage DSU property for his own personal gain. (D.I. 69 at 17) "Instead, Dougherty was disciplined for using a [DSU] dump truck and backhoe for his own personal use to deliver dirt to a third party. . . . Dougherty did not take the [] vehicles with the intention of permanently depriving [DSU] of them." (*Id.*) Dougherty was suspended for one day without pay as a result of his conduct. (*Id.*) DSU asserts that Richard Cathcart, the former Associate Vice President for Business Services, was the decision-maker in Dougherty's case. (*Id.*)

Viewing the evidence in the light most favorable to Maurice, the court finds that, based on the comparator evidence, a jury reasonably could conclude that Maurice's termination occurred under circumstances giving rise to an inference of unlawful discrimination. DSU's

16

arguments to the contrary are not compelling. According to DSU, Hewitt and Dougherty are not similarly situated to Maurice because: (1) they "did not steal [DSU] property or salvage the materials for their own personal gain," and (2) "different decision-makers were involved in their cases." (*See* D.I. 69 at 17) Both of these points represent disputed issues of material fact, and there is evidence from which a jury reasonably could find that Hewitt and Dougherty salvaged and/or used DSU property for personal gain, and their cases involved at least some of the same supervisors as in Maurice's case. (*See, e.g.*, D.I. 70, Exs. X, Z & AA; D.I. 77, Ex. F at 91) Thus, the evidence could establish disparate treatment based on the fact that Hewitt and Dougherty purportedly engaged in the same conduct as Maurice without such differentiating or mitigating circumstances that would distinguish their conduct or DSU's treatment of them for it. *See Davis*, 57 F. Appx. at 92; *see also Dempsey v. Del. Dep't of Pub. Safety*, 579 F. Supp. 2d 616, 622 (D. Del. 2008). Consequently, summary judgment should be denied as to Maurice's claim against DSU for racial discrimination under Title VII.

### C.     Maurice's Claim Against DSU for Title VII Retaliation

Maurice concedes that his claim against DSU for retaliation under Title VII fails. (*See* D.I. 77 at 14) Consequently, the court should grant summary judgment as to the retaliation claim.

### D.     Maurice's Claim Against DSU for Malicious Interference with Business Relationships

Delaware courts follow the definition of tortious interference with business relationships found in the Restatement (Second) of Torts. *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983 (Del. Ch. 1987)).

The elements of a claim for tortious interference with a business relationship include: "(1) the existence of a valid business relation or expectancy, (2) the interferer's knowledge of the

relationship or expectancy, (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted." *Corning Inc.*, 292 F. Supp. 2d at 585 (citation omitted).

However, a party may be "privilege[d] to compete or protect his business affairs in a fair and lawful manner." *De Bonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981). "The determination of whether an actor's conduct is 'privileged' or 'not improper' . . . is particularly factual, depending on a wide variety of factors to be applied to all of the facts and circumstances in a given case." *Id.* at 1154 (citing Restatement (Second) of Torts § 767). *See also Irwin & Leighton, Inc.*, 532 A.2d at 992-93 (discussing factors relevant to the determination of whether an actor's conduct is "privileged").

In the present case, Maurice claims that the Defendants made "malicious statements" that they "knew were not true" to Absolute, which caused Absolute to terminate his employment. (D.I. 77 at 14) According to Maurice, a co-owner of Absolute, named Will Mozingo, told him that "the ultimate reason his employment was being terminated, was because an administrator told Rob Thompson, co-owner, that [Maurice] could not work on campus unsupervised, due to allegations of theft." (*Id.*) Maurice further alleges that Kimeu Boynton, a DSU employee, "witnessed Mohammadi telling Rob Thompson that he did not want [Maurice] on campus." (*Id.*) Maurice maintains that, even though Absolute had other projects that were not located on DSU's property, Absolute terminated his employment to preserve its business relationship with DSU. (*Id.*)

The Defendants counter that Maurice "has presented no evidence that Defendants communicated to anyone at Absolute about his ability to work on projects at [DSU]," although

18

they do not deny doing so. (D.I. 69 at 19) The Defendants concede that "it is unclear why Absolute terminated [Maurice's] employment." (*Id.* at 20) However, the Defendants contend that, even if they informed Absolute that Maurice could not work on DSU property, "there were other Absolute projects that [Maurice] could have worked on" at other locations, but Maurice was fired anyway. (*Id.* at 20) Thus, the Defendants maintain that any alleged communication to Absolute "was not the reason for [Maurice's] termination as he could have been reassigned to other projects." (*Id.*) The Defendants also claim that they cannot be held liable for any alleged communication to Absolute "because they had a valid interest in making sure a former employee who was terminated for theft was not working unsupervised on [DSU] property." (*Id.*)

The record in this case is not well developed in connection with Maurice's claim for malicious interference with business relationships. There is a factual dispute concerning the extent of the Defendants' role, if any, in Absolute's decision to terminate Maurice. Viewing the facts in the light most favorable to Maurice, as the court is required to do at this stage, a jury question exists with regard to whether DSU interfered with Maurice's business relationship with Absolute. Thus, summary judgment should be denied.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the court grant-in-part and deny-in-part DSU's motion for summary judgment. (D.I 70) Specifically, summary judgment should be granted as to the due process claims asserted by Maurice and Micah, and the retaliation claim asserted by Maurice, and denied as to Maurice's claims for discrimination and malicious interference with business relationships.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. Appx. 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: September 29, 2014

Sherry R. Fallon
United States Magistrate Judge